RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CORY JARVELA,

*Plaintiff-Appellee*,

*v.*

WASHTENAW COUNTY, et al.,

*Defendants*,

RICHARD HOUK,

*Defendant - Appellant.*

No. 21-2820

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-12157—Mark A. Goldsmith, District Judge.

Argued: June 8, 2022

Decided and Filed: July 22, 2022

Before: SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Stephen J. van Stempvoort, MILLER JOHNSON, Grand Rapids, Michigan, for Appellant. Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee. John M. Peters, JOHN M. PETERS, PLC, Rochester Hills, Michigan, for Amicus Curiae. **ON BRIEF:** Stephen J. van Stempvoort, Keith E. Eastland, Richard O. Cherry, MILLER JOHNSON, Grand Rapids, Michigan, for Appellant. Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Appellee. John M. Peters, JOHN M. PETERS, PLC, Rochester Hills, Michigan, for Amicus Curiae.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  Cory Jarvela was bitten by a police dog after leading an officer on a high-speed chase and eventually fleeing on foot into a darkened, wooded area. Jarvela later brought this suit against Deputy Richard Houk, the dog's handler.  The district court denied summary judgment to Houk, holding that he had a constitutional duty to shout out a warning to Jarvela before searching for him with the dog.  We hold that Houk had no such duty, and reverse.

I.

We take the district court's view of the facts in the light most favorable to Jarvela, "except that we reject his allegations to the extent they are clearly contradicted by a videotape capturing the events in question."  *Hayden v. Green*, 640 F.3d 150, 152 (6th Cir. 2011) (internal citation omitted).

One night in August 2017, Cory Jarvela drank a half-dozen rum-and-cokes in his home near Clinton, Michigan, a small town about 20 miles southwest of Ann Arbor.  Around 1 a.m., he drove his Chevy Silverado to a Shell station to buy cigarettes.  Afterward, the store clerk called the police to report that "a drunk guy" wearing a white t-shirt had just left driving a black Silverado.  In a nearby police cruiser, Officer Robert Trevino spotted the Silverado almost immediately, speeding and drifting over the road's center line.  Trevino lit his rollers and began to pursue the truck.  Jarvela sped up outside of town, leading Trevino on an extended chase. After about five minutes, the road turned to gravel and the Silverado struck a tree head-on, hard enough to deploy its airbags.  Jarvela then fled on foot into a darkened area of trees, bushes, and chest-high weeds and grass.  Rather than pursue into the darkness, Trevino called for backup. Washtenaw County Sheriff's Deputy Richard Houk and his service dog, Argo, arrived thirteen minutes later.

Most of what followed was recorded on Houk's body camera.  Houk choked up on Argo's 15-foot leash, keeping the dog within five or ten feet.  Then he and Argo began searching

the area, with Houk shining his flashlight as they went. After about five minutes, Argo found a shoe and a white t-shirt in the grass; a few seconds later, the grass around Argo (who was not then visible) began to move around. Moments later—around 6:14 on the video—Jarvela was visible in the weeds as he wrestled with Argo, who was clinging to Jarvela's right arm. Houk began yelling at Argo to "packen" (a command meaning "grip" or "apprehend" in German) and "hold 'im." At 6:24 on the video, Jarvela begins to roll his body (over 200 pounds) on top of Argo's body (about 65 pounds), as Houk yelled at Jarvela, "Get on your stomach right now. Get down on the ground right now. On your stomach now." (Whether the roll preceded the command is not clear from the video.) At 6:30 on the video, Jarvela was on his knees with his chest against Argo and his arms bent near Argo's head. At 6:37, Houk steps forward and delivers seven blows to the back of Jarvela's body, yelling "Let go of the fucking dog now. Let go of the fucking dog." Trevino shot his taser at Jarvela, who rolled onto his back. Trevino then deployed his taser again, and Jarvela complied with commands to "get on your stomach." By 7:02 the officers have him cuffed.

Jarvela thereafter brought this suit under 42 U.S.C. § 1983, asserting claims of excessive force. The district court granted summary judgment to all the other defendants but denied Houk the same. He brought this appeal.

## II.

Our jurisdiction in this interlocutory appeal extends only to questions of law, which we review de novo. *Bey v. Falk*, 946 F.3d 304, 311–312 (6th Cir. 2019). The legal question here is whether Officer Houk was entitled to qualified immunity, on the facts as we must construe them in this appeal. *See Hayden*, 640 F.3d at 152. To demonstrate he was not, Jarvela must show both that Houk violated Jarvela's constitutional rights and that those rights were "clearly established"—meaning that the caselaw would have made clear to Houk "'that his conduct was unlawful in the situation he confronted.'" *Machan v. Olney*, 958 F.3d 1212, 1215 (6th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

To that end, Jarvela argues that Houk used excessive force in the course of Jarvela's arrest, in violation of the Fourth Amendment. Force is excessive when it is "objectively

unreasonable." *Hicks v. Scott*, 958 F.3d 421,435 (6th Cir. 2020). When applying that standard, we consider the amount of force used, on the one hand, and "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight," on the other. *Id*. (cleaned up).

Here, for purposes of this determination, we divide Houk's encounter with Jarvela into two phases: a tracking phase, which ended when Argo found Jarvela and first seized him by means of a bite; and a contact phase, which ended when Jarvela was handcuffed.

A.

We begin with the question whether Houk violated Jarvela's constitutional rights in the tracking phase, in which the only force he used was a bite (or bite and hold, to be precise) from a well-trained police dog, namely Argo. Among the various forms of force available to law enforcement, that is a comparatively measured application of force, which "does not carry with it a substantial risk of causing death or serious bodily harm." *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (cleaned up).

Meanwhile, the safety risks to the officers here were nearly identical to those in *Matthews v. Jones*, 35 F.3d 1046 (6th Cir. 1994)—in which the force at issue was likewise a bite from a well-trained police dog. There, like here, Matthews drove while drunk and led police on a high-speed chase, which ended when the plaintiff fled into a "wooded area in the dark of night." *Id*. at 1048, 1051. The circumstances the officers faced thus "provided a strategic advantage to Matthews in that he could easily ambush the officers[.]" *Id*. at 1051. And Matthew's "extreme behavior" in seeking to elude arrest—behavior which was no different from Jarvela's pre-arrest behavior here—"provided cause for the officers to believe" that Matthews had potentially been involved in more serious criminal activity. *Id*. We therefore held that "Matthews posed a threat to the officers' safety" as they searched for him in the darkened woods. *Id*. Suffice it to say that Jarvela posed the same threat to the officers here.

Like the district court, however, Jarvela emphasizes that, in *Matthews*, the officers "called out orders for [the suspect] to surrender." *Id*. at 1048. But the district court and Jarvela

both overlook that those warnings themselves came with a threat: that, if Matthews did not surrender, the officer would unleash the dog altogether. *Id.* The same was true in *Robinette*, where the officer warned the suspect and then unleashed the dog—which bit the suspect fatally, albeit constitutionally. 854 F.2d at 911-12. Those cases therefore do not support the proposition that an officer must always shout a verbal warning before tracking a suspect with a dog that the officer keeps on a leash. (Contrary to the district court's reasoning, our opinion in *Rainey v. Patton*, 534 F. App'x 391 (6th Cir. 2013) does not establish that proposition either—not least because unpublished decisions do not "clearly establish" anything. *See Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002).)

Moreover, as *Robinette* illustrates, we see no reason to think that the warn-then-unleash approach is on balance less forceful than the approach Houk employed here—which was to omit the warning and to keep Argo on a fairly tight leash. "There is a vast difference" between those two approaches; each has its pros and cons, depending on the circumstances. *See Melgar v. Greene*, 593 F.3d 348, 358 (4th Cir. 2010). And the warn-then-unleash approach can elevate risk for officer and suspect alike: for the officer, because the shouted warning reveals the officer's location; and for the suspect, because the dog will be beyond the officer's control when the dog finds him. Both approaches, however, fall within accepted police practice; and we would seriously overstep our judicial role if we were to hold that officers in every instance must adopt one approach or the other.

We therefore hold that the Constitution does not require a canine handler always to shout out a warning to a fleeing suspect. *Accord Escobar v. Montee*, 895 F.3d 387, 395-96 (5th Cir. 2018); *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009); *see also Thomson v. Salt Lake County*, 584 F.3d 1304, 1321 (10th Cir. 2009); *Johnson v. Scott*, 576 F.3d 658, 661 (7th Cir. 2009). And we hold that, under the circumstances facing the officers here, Houk did not violate the Constitution when he chose not to shout a verbal warning while tracking Jarvela with Argo on a leash. If Jarvela had wanted to surrender, he should not have fled on foot.

B.

More briefly, we hold that Houk is entitled to qualified immunity for his actions during what we call the contact phase. That phase is notable above all for its confusion, as Jarvela wrestled with Argo as the dog bit his arm, and Houk shouted commands with which Jarvela did not promptly comply. "When a person resists arrest—say, by swinging his arms in the officer's direction, balling up, and refusing to comply with verbal commands—the officers can use the amount of force necessary to ensure submission." *Rudlaff v. Gillispie*, 791 F.3d 638, 643 (6th Cir. 2015). Here, Houk ceased to use any force once Jarvela complied with Houk's commands to roll onto his stomach. And Jarvela has not identified any binding precedent that would have made clear to Houk that any of the force he used before then was unnecessary to ensure Jarvela's submission. Houk is therefore entitled to judgment on all of Jarvela's claims against him.

The district court's August 2, 2021 order is reversed as to its denial of summary judgment to Houk, and the case is remanded with instructions to enter judgment in favor of Houk.